regard to some kinds or degrees of negligence. We do say that the Government's position that the provision must be taken literally, so that the Government is not liable for the consequences of any conduct whatever of its representatives, is wrong.

We look then at the facts of the instant case. Progress on an enormous project, requiring tens of thousands of barrels of cement, is in jeopardy because of a threatened strike on the railroad which is to carry the cement. At least from the time in July when the strike had been called and was only averted at the last minute by the President's appointment of an Emergency Board, it was apparent that there was a strong possibility of a strike when the statutory waiting period would expire in September. Yet no steps were taken to avoid, by having the cement delivered by other means, the delay and damage to the plaintiffs which would certainly result if the job were closed down by the threatened strike. The possible consequences were so serious, and the action necessary to prevent those consequences was so slight, that the neglect was almost willful. It showed a complete lack of consideration for the interests of the plaintiffs. If the plaintiffs really included in their bid an amount to cover the contingency of such inconsiderate conduct on the part of the Government's representatives, the Government was buying and the public was paying for things that were worth less than nothing.

Our conclusion is that the non-liability provision in the contract, when fairly interpreted in the light of public policy, and of the rational intention of the parties, did not provide for immunity from liability in circumstances such as are recited in the plaintiffs' petition.

We do not discuss the plaintiffs' contention that the provision of the contract for a suspension of work and an equitable adjustment of the contract price to cover increased costs and damages for delays entitled the plaintiffs to such an adjustment. We note that the Corps of Engineers Claims and Appeals Board, in a companion case involving the same strike and the same plaintiffs, operating as another joint venture under a different name, supplying the aggregate for the concrete work, interpreted the suspension provision as the plaintiff would have us interpret it. The Board did not apply that interpretation to the instant contract because of the non-liability provision which it contained and the other contract did not. That interpretation, made by the agency that wrote the contract, and being against the interest of the Government, would seem to be authoritative, and to give the plaintiff another ground for recovery. But we do not decide that question.

The Government's motion is denied.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.

Michael N. CAVALLIOTIS

v.

The UNITED STATES.
No. 47324.

United States Court of Claims.
Jan. 11, 1955.

William B. Wolf, Washington, D. C., for plaintiff. Simon Fleishman and William B. Wolf, Jr., Washington, D. C., were on the brief.

Thomas F. McGovern, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

On October 17, 1942, defendant requisitioned the Louise, a wooden vessel of 298 net tons and 530.68 gross tons, the property of plaintiff. The vessel was lost in a storm off Cape Hatteras on December 16, 1942.

The question presented is just compensation for her taking.

As is usual, the testimony of the expert witnesses on valuation varies widely, and we are again presented with the question of evaluating this testimony.

Plaintiff's witnesses were Harry Kane, Stephen J. Horkay, Constantine E. Mericas, and James Donald, not including plaintiff himself. The estimates of value even among these witnesses varies greatly. Mericas fixed the value at $200,000 plus an additional $50,000 if the ship was adapted to the carrying of explosives. Horkay fixed the value at $135,-000; Kane fixed the value at between $200,000 and $250,000; and Donald fixed the value at $92,500. These values were on the assumption that the vessel was in class, or seaworthy.

None of plaintiff's witnesses had seen the vessel and they were not apprised of her actual condition before giving their estimate of her value. Donald, upon whose testimony the Commissioner chiefly relied in determining the value of $77,500, arrived at this figure by first estimating the ship's value in class at $92,500 and from this he deducted the amount of $15,000 as the amount he understood was necessary to be spent in order to put her in class. He, however, did not take into consideration the fact that after the Government requisitioned her it not only paid $15,000 to plaintiff for the work he was employed to do on the vessel, but it also paid the sum of $23,-493.72 to the General Ship Repair Company for additional work they did on the vessel, the nature of which is not clearly apparent. If Donald had deducted not only the $15,000 but also the $23,493.72 from his value of the ship in class, $92,-500, we have left a value of $54,006.28 at the time the ship was requisitioned by the defendant.

█ The testimony of these witnesses, who had not seen this vessel and who were not apprised of her actual condition, is not of great value. This ship had been laid up at a dock in Baltimore since 1928. She had been lying there without any protection for her engines or hull until plaintiff purchased her 14 years later for the sum of $20,000.

The testimony of defendant's witnesses, Frederick W. Schilpp, Francis R.

Nichols, and Alfred W. Kabernagel, shows that she was in a deplorable condition, as might have been expected. Schilpp, who was a marine appraiser and surveyor employed by the Boston Insurance Company of Boston, Massachusetts, inspected this ship for certain Nova Scotia people who were interested in buying her. He said that he determined that she was a "dead ship," and he advised his clients to abandon any thought of purchasing her under any conditions. He says that "her timbers were rotten, her waterways were rotten, her housing sills had wasted away, the ceiling was so badly wasted that, in the past, somebody had put in cement over it to hide the soft place," and that "there wasn't any framing to support the ceiling and the planks that were on it." He said the vessel "could have been rebuilt, if you wanted to build a new vessel. You would have to go from the keel; her floors had to be timbered, and new beams and decking and sills, and everything else." He said it would have been necessary to "tear all of the planking off her, and put on new framing and possibly a new keel, new back-bone." "You would have had to start right at the keel, and I am definitely sure you would have found the keel doty. * * * I would say about the engines, with no care, having been lying there for fifteen or sixteen years, the corrosion would have played havoc with her. That, again, would have been a gigantic job to put her on her feet." Again he said, when asked how much she was worth, "I hate to tell you. Anybody here may think I am crazy, but the only thing that you could recover for on her would have been for junk, her boilers and engines, and what you could get out of the auxiliaries and machinery; and if you could have gotten $5,000, you would have gotten too much."

After plaintiff purchased the vessel, he asked the Coast Guard to survey her and indicate the work necessary to be done in order to put her in class.

Alfred W. Kabernagel, the marine inspector in charge at Baltimore, Maryland, said he sent two inspectors down there to see what was necessary to be done to place the vessel in a seaworthy condition. These inspectors marked many planks, more than 100, with yellow crayon indicating that these planks should be removed, and indicated other work to be done. The plaintiff then employed some Greek sailors to do the work pointed out by the surveyors. He testified that he spent about $70,000 in doing so, but he was not able to substantiate by checks and vouchers a substantial part of this sum. After plaintiff had made a showing of complying with the inspectors' requirements, Kabernagel says they finally decided to issue the vessel a provisional certificate, which was done. He said, however, that it should be borne in mind "that the country was at war, and while I had no direct orders from my superiors, it was the accepted policy to put everything in service that had the possibility of floating, because our losses from the submarines were colossal."

The vessel was then loaded with dynamite and other explosives, and put to sea as a part of a convoy. She commenced smoking very badly, however, just about the time the voyage started, and the officer in command of the convoy would not let her proceed further, but ordered here to return to port.

After the vessel had returned to port, Kabernagel personally gave her a very thorough inspection. He found that in some instances plaintiff had painted over the yellow crayon marks which the inspectors had placed on planks indicating that they should be removed, and in other instances had nailed a one-inch plank over the spots. He says that of the planking in the cargo hatch which had been designated for renewal, only 50 percent had been renewed, and only 25 percent of the rotten planking in other parts of the ship. He said his examination indicated that the work which would have to be done to put the vessel in a seaworthy condition would have cost approximately $90,000. He lifted the certificate until this work was satisfactorily done.

Francis R. Nichols, who was a marine inspector in the office of the Captain of the Port at Norfolk, also inspected the vessel. He said the planking on the forecastle deck was rotted and broken so that "you could see the cargo right through the deck." He said he took an iron stanchion, with a blunt end, to "probe around the guard rail, to determine the soundness of the wood hull, and at one particular point the stanchion went through the hull into the interior of the vessel." He also said, "a similar condition was found on the opposite side." He said she was definitely not in a seaworthy condition.

Alfred W. Young was a marine surveyor for the Fireman's Fund Insurance Company, and at the time of the requisition of this vessel was the vice president of the Inter-American Navigation Company, which was the governmental agency to which this vessel was turned over after it had been requisitioned. He said he made a survey of the vessel and found a lot of rot in the hold. He says, "and the minute I saw this rot I knew something was wrong with this vessel because I had seen hundreds of them the same way practically, and I just threw up my hands and I said, 'Mitchell ———.'" He further says, "I took a knife out and jabbed it in a couple of frames and the knife went out of sight, and I put a finger in it, and some of it was so rotten my finger would go right in it." He says these places "were a material part of the structure of the ship," affecting her strength.

Defendant's witness Young testified: "At the time we looked at her, with all the dry rot in her, she didn't have—you couldn't sell it, I don't think." "She would have to be overhauled, as she ultimately was, and even then she wasn't too good." * * * "a boat like that—she didn't have any value. I saw lots of other ones that were down in this Reedsport, and they were totally valueless. You couldn't give them away for scrap, and this one was just about the same thing, except the owner had put it together and had put new timbers in it and new wood that I saw, and therefore she had some value * * *." "I estimated at that time for the company's record that she was worth $30,000.00." He explains this valuation in this way: "* * * as I say, the boat was no good; it never was any good, and no matter how much money we spent on that boat, even then she wasn't any good, because you can't put a boat together and bring it up to any value, and I said —all I say she was worth was what they spent in performing the repairs, which was $30,000.00."

Another of defendant's witnesses, a man by the name of Edward N. Carman, Jr., an appraiser for Lloyd's, placed a value of $50,000 on the vessel.

Both Young and Carman had made a thorough inspection of the vessel. Their estimates of value were made by these men as a part of their regular commercial duties and not for the purpose of this litigation.

On the other hand, plaintiff's witnesses had not seen the vessels and when they were asked to give their estimate of her value, they were not apprised of these conditions. We cannot, therefore, give a great deal of weight to their testimony.

Plaintiff insured her for $50,000. After she had been requisitioned and some $48,000 had been spent on her, she was insured by the Inter-American Navigation Company for $80,000; and when she became a total loss, the insurance company paid this amount.

The Maritime Commission valued her for just compensation purposes at the sum of $45,000.

We think the maximum amount to which plaintiff is entitled is the sum of $50,000, which is the highest valuation placed on the vessel by any of defendant's witnesses. As we stated above, this is about what the testimony of James Donald, plaintiff's witness, amounts to, when we take into consideration the fact that the Inter-American Navigation Company spent not only $15,000 on the boat, which Donald took into consideration, but also $23,493.72, which he did not take into consideration. Tak-

ing this latter sum into consideration, plaintiff's witness Donald's valuation amounts to about $54,000.

As a part of just compensation, plaintiff is also entitled to interest at 4 percent per annum on $50,000 from the date of requisition on October 17, 1942 until January 7, 1946, when defendant paid three-fourths of the award of $45,000 into the United States District Court in Baltimore, Maryland. From that date until December 29, 1948, the delay in payment seems to have been the fault of plaintiff, and no interest is allowed during this period. Plaintiff is, however, entitled to interest at the same rate from December 29, 1948, to the date of payment of the judgment, on $16,250, the difference between $50,000 and $33,-750, the amount the defendant paid in the United States District Court in Baltimore, Maryland.

Judgment for $50,000, less the sum of $33,750, plus interest computed as above set out, will be entered in favor of plaintiff.

JONES, Chief Judge, and LARAMORE, MADDEN, and LITTLETON, Judges, concur.

**STANDARD-VACUUM OIL COMPANY,**

v.

**THE UNITED STATES.**

No. 48319.

United States Court of Claims.

Decided Jan. 11, 1955.

Cravath, Swaine & Moore, New York City, for plaintiff. Albert R. Connelly and George S. Collins, New York City, were on the brief.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

This case is before us on defendant's motion for a new trial under Rule 54(b) (5) and (6), 28 U.S.C.A., or, in the alternative, for reconsideration of the or-